T.C. Memo. 1997-446


UNITED STATES TAX COURT


JOHN FRANKLIN FOUST, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4162-95.               Filed September 30, 1997.


John Franklin Foust, pro se.

<u>Loren B. Mark</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  Respondent determined a deficiency in petitioner's Federal income tax and an addition to tax and a penalty as follows:

| Year | Deficiency | Addition to tax Sec. 6651(a)(1)[1] | Penalty Sec. 6662 |
|------|-----------|-----------------------------------|-------------------|
| 1989 | $75,389 | $3,769.45 | $15,077.80 |

Following concessions by the parties,[2] the issues for decision are whether: (1) Petitioner is entitled to a farm loss deduction of $110,000 for farm rents purportedly paid; (2) petitioner had unreported income from one of his S corporations, Cheyenne River Corp., Inc. (Cheyenne), by reason of its constructive receipt of Federal disaster and crop insurance payments to its creditors; (3) petitioner is entitled to a Schedule E loss from Cheyenne that was not reported on Cheyenne's Form 1120S; and (4) petitioner is liable for a section 6651(a)(1) addition to tax for failing to timely file his 1989 Federal

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Except for respondent's determinations shown above, dollar amounts have been rounded to the nearest dollar.

[2] Petitioner conceded the claim asserted in his petition that a substantial amount of the payment he received in a contract settlement with his former employer, see infra note 5, should be excluded from gross income under sec. 104(a)(2). Respondent conceded that petitioner was entitled to a net operating loss deduction of $53,979 claimed in his return, representing a carryover from a prior year, that had been disallowed by the statutory notice of deficiency. Petitioner raised at trial and on brief a further claim of entitlement to an unused investment tax credit carryover from 1987; the Court did not consider this claim, as not having been properly pleaded, as having been raised too late, and as lacking foundation in the record.

income tax return and the section 6662 accuracy-related penalty. We sustain respondent's determination on each contested issue.

FINDINGS OF FACT

Background

Most of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference.

At the time of filing the petition in this case, petitioner was a resident of Lemmon, South Dakota. Petitioner was married during the entire year 1989, the year at issue in this case, to Mary S. Foust (Mrs. Foust). On October 16, 1990, petitioner filed a separate individual Federal income tax return for 1989 with the Internal Revenue Service Center at Kansas City, Missouri, showing zero taxable income and no tax liability. Pursuant to applications for extension, petitioner had until October 15, 1990, to file his return.

Petitioner was a practicing Iowa certified public accountant from 1971 until 1976 and from 1989 through the time of trial. Petitioner holds a law degree from Drake University, but has not been admitted to practice law in any jurisdiction.

Petitioner's Farming-Related Activities

On February 22, 1985, petitioner incorporated Cheyenne; he acquired all its shares and caused it to become an S corporation. Petitioner organized Cheyenne for the purpose of farming, by

crop-share arrangement, 804 acres of farmland owned by Mesa Corp. (Mesa), an S corporation whose shares were owned by Mrs. Foust. Mrs. Foust obtained her shares of Mesa from petitioner without consideration. Mesa's Form 1120S for 1989 reported $60,000 of rental income, expenses of $46,171, consisting primarily of depreciation and interest, and taxable income of $13,829.

On March 6, 1986, petitioner purchased a 160-acre farm in Lucas County, Iowa. On the same date, petitioner and Mrs. Foust conveyed this farm to Teton Corp. (Teton), an S corporation whose shares were beneficially owned by petitioner's minor children, Brian John Foust and Michael Franklin Foust. Cheyenne began farming Teton's land in addition to Mesa's land. Teton's Form 1120S for 1989 reported the receipt of rental income of $52,200 and taxable income of $31,754.

Mrs. Foust also owns the shares of Iowa Prairie Corp. (Iowa Prairie), an S corporation engaged in the manufacture of small wooden "miniatures" that were sold in craft stores. During the year in issue, Iowa Prairie neither conducted any farming activities nor owned or leased any farm land. There were no written rental agreements among or between petitioner, Cheyenne, Iowa Prairie, Teton, or Mesa. Petitioner did not engage in any farming activities in 1989.

Petitioner and his brother James D. Foust (James) had engaged in several joint farming and farm-related ventures,[3] including the conduct of farming through Foust Bros. Farms, Inc. (Foust Bros. Farms).  Foust Bros. Farms applied for and received disaster loans from the Small Business Administration (SBA) and the Farmers Home Administration (FMHA) that were personally guaranteed by petitioner and James.  At the times the FMHA and the SBA approved the loans to Foust Bros. Farms, petitioner and James had led the lenders to believe that they were lending to a separate corporate entity, independently operated and maintained.  However, Petitioner and James did not keep separate books and records for Foust Bros. Farms.  Petitioner and James so

[3] The parties have stipulated that, in addition to Foust Bros. Farms, Teton, Mesa, and Cheyenne River, petitioner filed articles of incorporation with the Iowa Secretary of State for the following named corporations, as indicated:

| | |
|---|---|
| Foust Brothers Leasing Co. | 1977 |
| Wind River Corp. | 01/04/80 |
| Ag-Land Investments, Ltd. | 01/05/83 |
| Southern Cross, Inc. | 01/05/83 |
| Blackhorse Corp. | 01/05/83 |
| Butte Corp. | 11/02/83 |
| Bend Corp. | 11/02/83 |
| Williston Corp. | 11/02/83 |
| Ranger Corp. of U.S. | 11/02/83 |
| Savannah Corp. | 11/02/83 |
| Thunderhawk Ltd. | 11/02/83 |
| XIT, Inc. | 09/18/84 |
| Cathedral Corp. | 04/11/86 |
| Agrivest Corp. | 01/09/87 |
| Senora Corp. | 01/09/87 |
| West Texas Corp. | 01/09/87 |

commingled the funds and assets of Foust Bros. Farms with their personal funds and those of other corporations as to cause the bankruptcy court to pierce the corporate veil and hold (see below) Foust Bros. Farms and the other corporations used by petitioner and James to carry on their farming and farm-related activities to be their alter egos and ineffective for the purpose of providing corporate limited liability.

Petitioner's Bankruptcy Proceedings

On July 22, 1988, petitioner filed a chapter 12 petition in bankruptcy with the U.S. Bankruptcy Court for the Southern District of Iowa.[4]  On August 10, 1988, petitioner filed a Statement of Financial Affairs and related bankruptcy schedules in the bankruptcy proceeding.  On the Statement of Financial Affairs, a sworn statement, submitted under penalty of perjury, petitioner purported to list all his assets and liabilities.  The Statement of Financial Affairs did not contain any reference to unpaid rent owed by petitioner to Mesa or Teton.

On December 29, 1988, the chapter 12 bankruptcy proceeding was converted to a chapter 7 proceeding.  On January 23, 1989, petitioner filed a new sworn Statement of Financial Affairs, which made no mention of unpaid rent owed to Mesa and Teton.

---

[4] On Apr. 13, 1988, James had filed a personal chapter 7 petition in bankruptcy.

On March 28, 1989, a Discharge Order was issued with respect to petitioner's chapter 7 bankruptcy proceeding.  Petitioner's bankruptcy schedules listed unsecured creditor's claims totaling $216,820, more than $100,000 of which were discharged in bankruptcy.

The SBA filed with the bankruptcy court a creditor's claim against petitioner and James in the amount of $49,646, arising from its emergency disaster loan to Foust Bros. Farms.  The FMHA filed creditor's claims with the bankruptcy court arising from a disaster loan to Foust Brother's Farms against petitioner and James in the amounts of $56,505 and $48,700, respectively.  In response to a complaint filed on behalf of the SBA and FMHA by the U.S. Attorney's Office for the Southern District of Iowa, the bankruptcy court held, following a trial, that petitioner and James were personally liable for the debts of Foust Bros. Farms and that their debts to the SBA and the FMHA were not dischargeable in bankruptcy.  The bankruptcy court entered judgments against petitioner, in favor of the SBA in the amount of $49,646, and in favor of the FMHA in the amount of $56,505. The findings and order of the bankruptcy court were upheld as to petitioner by the District Court of the Southern District of Iowa and the Court of Appeals for the Eighth Circuit.

Cheyenne's Bankruptcy Proceedings

On February 28, 1989, petitioner filed a voluntary chapter 12 petition in bankruptcy for Cheyenne. Cheyenne failed to fulfill its duties as a debtor-in-possession and to file complete and adequate schedules with the bankruptcy court. Cheyenne also failed to cooperate with the trustee in bankruptcy and to provide the trustee with financial information. As a result, Cheyenne's petition was dismissed on May 15, 1989.

On June 20, 1989, petitioner filed a second voluntary chapter 12 petition in bankruptcy for Cheyenne. This petition was also filed without the required statements and schedules. On July 18, 1989, this petition was dismissed.

In 1989, the Agricultural Stabilization and Conservation Service (ASCS) owed a 1988 corn and soybean disaster payment to Cheyenne in the amount of $37,723. ASCS distributed the disaster payment to the Commodity Credit Corporation (CCC) and the SBA, creditors of Cheyenne, in the amounts of $34,171 and $3,552, respectively. Cheyenne did not report the $37,723 disaster payment on its 1989 Form 1120S.

In 1989, Cheyenne was also entitled to receive a Federal Crop Insurance (FCI) payment in the amount of $43,496 from Thurston Fire & Casualty Insurance Co. In 1989, the $43,496 FCI payment was made to AG Services of America, a creditor of Cheyenne that had financed its farming operations in earlier

years.  Cheyenne did not report the $43,496 FCI payment on its 1989 Form 1120S.

On July 28, 1989, petitioner purchased 19 cashier's checks in the total amount of $183,000 from Valley National Bank, Des Moines, Iowa.[5]  Petitioner deposited 11 of these checks, totaling $110,000, into the bank account of Iowa Prairie.

Cheyenne's 1989 Form 1120S reported "no activity" and showed no income or expenses.  Nonetheless, petitioner claimed a current net operating loss flowthrough from Cheyenne in the amount of $11,503.  Petitioner claims to have paid personally $110,000 to Mesa and Teton for rental expenses that Cheyenne was unable to pay.  Petitioner claimed a deduction for those alleged payments on his 1989 Federal income tax return.

Petitioner was aware that he was required to maintain records sufficient to support the positions taken on his Federal income tax returns.  Nonetheless, petitioner did not retain receipts of transactions, maintain books of account, or prepare financial statements for himself or any of the corporate entities in which he had an interest.

---

[5] Petitioner received a "contract settlement" in 1989 in the amount of $183,000, which he reported as income on his 1989 return, in connection with the termination of his employment as Vice President of Financial Affairs and Chief Financial Officer of the University of Osteopathic Medicine & Health Sciences of Des Moines, Iowa.  However, the record does not disclose any of the facts surrounding the contract settlement, nor whether the $183,000 was used to purchase the cashier's checks.

## OPINION

Respondent's determinations are entitled to a presumption of correctness, and petitioner bears the burden of proof with respect to all issues in this case.  Rule 142(a).  Petitioner must substantiate the amounts and payments of claimed expenses and demonstrate the validity of his claims of deductions therefor.  Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Each of respondent's determinations arose from one aspect or another of petitioner's farming operations in prior years. Because of his failures to maintain and offer in evidence records and receipts or other required documentation, petitioner has not carried his burden of proof and persuasion on any of his substantive claims.  By reason of his failures to provide any explanation or justification for his errors and omissions in the preparation and filing of his 1989 return, petitioner has not carried his burden on the addition and penalty issues.

Issue 1:  Farm Rents

Petitioner contends that Cheyenne owed Mesa $60,000 and Teton $50,000 for rental obligations incurred by Cheyenne and petitioner in years prior to 1989.

Petitioner did not schedule any such claims against himself in his bankruptcy proceeding, and the bankruptcy petitions he filed on behalf of Cheyenne were dismissed for failure to file

proper schedules. We reject the notion that petitioner--or any bankrupt--can obtain a discharge of debts owed to unrelated parties and preserve purported other claims for the benefit of his wife and children by failing to schedule them in the bankruptcy proceeding.

Petitioner contends that the $110,000 he deposited into the bank account of Iowa Prairie was a payment of rents owed by Cheyenne to Mesa and Teton. Iowa Prairie did not engage in any activity related to farming or to Cheyenne, Mesa, or Teton. Petitioner contends that he deposited money in the account of Iowa Prairie for payment of rent Cheyenne owed to Mesa because Mesa did not have its own checking account. Petitioner provides no such explanation, nor any other explanation, with respect to the rent Cheyenne allegedly owed to Teton. There is no evidence in the record showing how, if at all, the alleged $110,000 of payments was ultimately received by Mesa and Teton.

For 1989, Mesa and Teton reported rental income in the amounts of $60,000 and $52,200, respectively, and taxable income of $13,829 and $31,754, respectively. Mrs. Foust owns the shares of Mesa and is trustee of the shares of Teton beneficially owned by petitioner's and Mrs. Foust's children.

Petitioner has presented neither any evidence that he was personally liable for the debts of Cheyenne nor any evidence of the terms of any arrangements under which Cheyenne would have

owed rent to either Mesa or Teton.  Respondent has drawn our attention to evidence in the record that tends to suggest that Cheyenne had a sharecrop arrangement with Mesa under which a cash payment of rent would not ordinarily be due.  Because we find that petitioner has failed to substantiate that either he or Cheyenne was obligated to make the payments,[6] or that Mesa or Teton actually received them, we uphold respondent's determination that petitioner is not entitled to a deduction of $110,000 for payment of rents owed to Mesa and Teton.

Issue 2:  Petitioner's Unreported Income

Cheyenne, an S corporation whose shares were owned by petitioner, conducted farming activities through 1988.  ASCS owed Cheyenne a disaster payment of $37,723.  In 1989, this amount was distributed by ASCS to creditors of Cheyenne, CCC and SBA, in the amounts of $34,171 and $3,552, respectively.  Cheyenne was also entitled to a Federal crop insurance payment in the amount of $43,496.  In 1989, this amount was distributed by the payor to AG Services, a creditor of Cheyenne that had furnished goods and services to Cheyenne for use in its farming activities.

---

[6] In the absence of a personal obligation of petitioner, the payments by petitioner would be treated as capital contributions to Cheyenne, and constructive payments by Cheyenne to the payees. Because Cheyenne was an S corporation whose shares appear to have been owned by petitioner during 1989, any loss arising from deductible payments constructively made by Cheyenne would properly flow through to petitioner for Federal income tax purposes.

Section 61(a) defines gross income as "all income from whatever source derived, including * * * Income from discharge of indebtedness". In 1989, the ASCS disaster payment and the Federal crop insurance payment were applied in their entirety to discharge Cheyenne's debts due and owing. Therefore, Cheyenne had income in 1989 to the extent of the debts discharged, and this income flowed through to petitioner by reason of the operation of subchapter S.

The debts of Cheyenne were not discharged in bankruptcy. Regardless of whether petitioner was relieved of any personal liability for Cheyenne's debts by the discharge order of the bankruptcy court, Cheyenne's petitions in bankruptcy were both dismissed. Therefore, as to Cheyenne, these debts were not discharged in bankruptcy.

Petitioner has not established that the Federal crop insurance payments are excludable from the gross income of Cheyenne. The insurance coverage applied in the event of nonproduction rather than destruction. The crop insurance was paid because crops could not be produced, not as compensation for a casualty loss. "It is well settled that proceeds from a business interruption policy, which compensates for lost profits or earnings, are taxable as ordinary income". Seidenfeld v. Commissioner, T.C. Memo. 1995-61; see also Massillon-Cleveland-Akron Sign Co. v. Commissioner, 15 T.C. 79 (1950).

Petitioner has not established that the disaster payment is excludable from Cheyenne's gross income.[7] Petitioner has not shown that Cheyenne was entitled to receive the disaster payment by reason of having sustained any casualty loss for which it would have been entitled to a casualty loss deduction under section 165. As a small business corporation engaged in farming, Cheyenne in all likelihood had used the cash method of accounting. Secs. 447 and 448. As a result, it would have had no basis in the crops of a prior year in respect of which it was entitled to a disaster payment. Lacking any such basis, it would not have been entitled to a casualty loss for which the disaster payment would have acted as reimbursement.

Issue 3:  The Schedule E Loss

On his 1989 personal Federal income tax return, petitioner claimed a Schedule E loss from Cheyenne in the amount of $11,503. Cheyenne's Form 1120S for 1989 did not display any such loss, and petitioner did not file an amended return for Cheyenne's 1989 taxable year.

Petitioner has failed to substantiate the Schedule E loss claimed on his 1989 personal return. Cheyenne's Form 1120S was marked "no activity", and the evidence in the record indicates

---

[7] Petitioner did not proffer evidence or argument that disaster payments would be excludable from Cheyenne's income as disaster relief, cf. Bannon v. Commissioner, 99 T.C. 59, 62-63 (1992), or as Federal subsidies covered by sec. 126.

that Cheyenne did not conduct any farming activities in 1989. Petitioner has presented no evidence to explain or substantiate the $11,503 loss.  In the absence of any evidence substantiating or explaining petitioner's entitlement to the loss, respondent's determination disallowing the loss is upheld.

Issue 4:  The Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes an addition to tax in the event a taxpayer fails to timely file his tax return.  The addition to tax applies unless the taxpayer establishes that his failure to file was due to reasonable cause and not willful neglect.

With extensions, petitioner's 1989 personal Federal income tax return was due on October 15, 1990.  The parties stipulated that the return was mailed on October 16, 1990; the return bears a stamp indicating that the envelope was postmarked on that date. At the trial, petitioner did not provide any explanation for his delinquent filing.  Petitioner's brief included some vague assertions about why the envelope was erroneously postmarked on October 16, rather than October 15, but these assertions are not supported by the record and they directly contradict a stipulated fact.

Petitioner has failed to provide any evidence that the late filing of his 1989 personal Federal income tax return was due to reasonable cause and not willful neglect.  We uphold respondent's determination that petitioner is liable for the section

6651(a)(1) addition to tax in an amount equal to 5 percent of the deficiency.

Issue 5:  The Section 6662(a) Penalty

Section 6662(a) imposes a 20-percent accuracy-related penalty for, among other reasons, negligence or disregard of rules or regulations.  Section 6001 requires taxpayers to maintain records to support positions taken on their Federal income tax returns.  In this case, petitioner failed to produce any documentary evidence to support the positions taken on his return, with respect to the alleged rental payments, other than the amounts reported as rental income on the returns of related taxpayers.  As a practicing certified public accountant with legal training, petitioner should have known that he was required to maintain and produce such documentary evidence, and his failure to do so is clearly negligent.

An alternative ground for the imposition of the section 6662(a) accuracy-related penalty--set forth in the statutory notice--is substantial understatement of income.  Sec. 6662(b)(2).  Section 6662(d)(1)(A) defines a substantial understatement as the greater of "(i) 10 percent of the tax required to be shown on the return for the taxable year or, (ii) $5,000."  Petitioner reported no tax liability on his 1989 personal Federal income tax return.  Respondent has determined,

and we have upheld, a deficiency that will substantially exceed $5,000.

Respondent's determination that petitioner is liable for the section 6662(a) penalty is upheld.

To reflect the foregoing and to give effect to the parties' concessions,

<u>Decision will be entered under Rule 155</u>.